JAMES L. MIMS and JAMES D. BURDETT, sub-enrolling officers, plaintiffs in error, vs. JOHN K. WIMBERLY, defendant in error.

1. Judges and other magistrates of any one of the Confederate States of America, having authority by the laws of that State to issue the writ of *habeas corpus*, and to adjudicate the case made by the petition and answer, have jurisdiction in such cases arising under the Enrolling Acts of the Confederate Congress.

*Habeas Corpus*, decided by Judge HOOK.

The statement of the case appears in the opinion of the Court.

GEORGE T. BARNES, for the plaintiffs in error.

JOHN C. SNEAD, for the defendant in error.

*By the Court.*—JENKINS, J., delivering the opinion.

The defendant in error, Jno. K. Wimberly, applied to his Honor, Jas. S. Hook, Judge of the Middle District, alleging that he was illegally restrained of his liberty by J. L. Mims and J. D. Burdett, enrolling officers of the Confederate States, who had enrolled him for military service, and ordered him to repair to a camp of instruction. That in truth and in fact, the applicant was, by the terms of the Enrolling Acts, whence they derive their authority, exempt from military duty. Wherefore he prayed the Judge to issue the writ of *habeas corpus* against the said Mims and Burdett, and upon its return to inquire into the legality of his imprisonment, etc. The writ was issued ; the defendants appeared, admitted service, and answered that the petitioner was subject to enrollment for military service, under the Acts of Congress. And further, they pleaded, that being so liable, and having been enrolled, under said Acts, " the case is within the limits of the sovereignty assigned by the Constitution to the Confederate States, and a *habeas corpus* issued by a State Judge or Court has no authority within said limits. Wherefore, they submit that this Court, being, for these reasons, without jurisdiction, this application for discharge should be dismissed." The case was submitted solely upon the plea to the jurisdiction. His Honor Judge Hook overruled the plea, and defendants excepted. The sole question before us, then, is that of jurisdiction.

Counsel for plaintiffs in error has presented a series of propositions, arranged in logical sequence, from which he deduces the conclusion that the Courts of Georgia have no jurisdiction in the case:

First, he maintains that " the Confederate Government is sovereign, within the sphere of its delegated powers."

The term *sovereign* has a very exact significance, but is often loosely applied. Politically speaking, it is, in strictness, applicable only to ultimate authority, residing either in an individual or in a body of individuals. In some forms of government, it may be difficult to determine where it resides. Under

our complex system, in which sundry republics are found, governing separately and also in confederation, great care should be taken to avoid confusion of ideas on this subject. A descriptive term, erroneously applied to rightful authority, may, in time, lead to mistaken ideas of its true nature and extent. These may induce abuses of power; these, again, political controversies, party divisions, possibly overthrow of salutary institutions.

A striking example of this may be seen in the first words of a document no less solemn and imposing than the Constitution of the United States; and the error will be found exerting a pernicious influence upon so august a tribunal as the Supreme Court of the United States, even whilst Marshall, in the full vigor of his grand intellect, presided over its deliberations. The preamble of the Constitution recites, that *"the people of the United States,* in order to form, etc., do ordain and establish this Constitution." Here is the first error, prolific of confused ideas of our political system. Thirty years later, in the case of Martin vs. Hunter's Lessees, (1 Wheaton's S. C. Reports, 304,) Mr. Justice Story, delivering the opinion of the Court, says: "The Constitution of the United States was ordained and established, not by the States, in their sovereign capacities, but emphatically, *as the preamble of the Constitution declares, by the people of the United States."* Beyond all cavil, the establishment of a Constitution, the fundamental law, is a high exercise of popular sovereignty. The idea, then, expressed in the preamble, and urged by Mr. Justice Story, as clearly indicating the character of the Government, is that the people of the United States, as an aggregate, sovereign community, or body-politic, ordained and established the Constitution. This assertion is against the truth of history, and is refuted by the Constitution itself.

What are the historical facts? The people inhabiting the States, afterwards united under that Constitution, were but once in general convention, for the purpose of establishing it. The members composing that convention were appointed by the Legislatures of, and represented, the several States; they voted, on all questions coming before the convention, by

States, each State having one vote; and in registering the yeas and nays in their journal, they caused the names of the States, and not of the individuals representing them, to be entered. When the instrument was completed and engrossed for signature, they say, in the attesting clause, "Done in Convention by the unanimous consent of *the States present.*" But, further, when this was done, and the signatures attached, did the instrument framed by them stand upon their attestation and signatures as the Constitution of the United States? By no means. The whole proceeding, thus far, was only consultative; all this machinery was employed to concentrate opinion, and thereby prepare a project likely to command acceptance. The joint production of so many great intellects was simply a draft to be submitted, for ratification or rejection, to their principals. Whilst, therefore, it is both interesting and instructive to remark, that in the review of this preliminary proceeding, we find ourselves, at every step, treading in the foot-prints of State sovereignty, the most severe test, the clearest demonstration, is to be found in the ratification, which alone gave efficacy to the instrument. If, as averred in the preamble, that act was to be performed by "the people of the United States," as an integral community, it should have been done in one of two ways: either by a direct vote of the whole people, (the majority controlling,) or by *a* convention, of delegates elected by them. So it is in the adoption of State Constitutions. Not so, however, in this case. The draft, having been made public, was submitted to the separate action of the people of each State, in convention. Eleven States, each for itself, ratified it; and they formed the Union, speedily organizing a Congress, and electing a President and Vice President. The remaining two deferred ratification, and were recognized as out of the Union. In the first session of Congress under the Constitution, these two were treated as foreign States, though the door was still left open, and inducements presented, for their subsequent accession to the Union. Though somewhat tardily, they did accede to it, before the end of the second session of that Congress. But where was the asserted sovereignty of the people of the

United States, whilst these two stood sullenly aloof?    What sovereignty, but its own, eventually brought each in, at a different time?  I ask, then, tried by the touchstone of history, how much of truth is there in Mr. Justice Story's proposition?

But the last article of the Constitution, which looks to action, refutes the preamble, which is simple recital.    It is in these words: "The ratification of the conventions of nine States shall be sufficient for the establishment of this Constitution, *between the States so ratifying the same.*"

Thus we see *first*, that the question of ratification or rejection was never intended to be submitted to the conjoint action, direct or indirect, of the whole people of the United States, but to the separate action of the peoples of the several States; *secondly*, that there could be no ratification whatever, unless nine of the States, separately acting, consented thereto; *thirdly*, that their consent ratified it only as between themselves.   Had every voter in each State, except Rhode Island, given his suffrage for ratification, a bare majority for rejection, in that feeble State, would have left her foreign to the rest.   And this is the concluding, the creative clause of that Constitution, which opens with the solecism " we the people of the United States."   The deplorable consequences of this inexplicable error, may be traced not alone in the judicial records, but also in the legislative and executive journals of that ill-fated Union, and who shall say how far they contributed to its disruption?   I am fully sensible of the boldness of this criticism, and could have been prompted to it, only by a clear perception of truth violated, and error working mischief.

Happily for us, the Convention that framed the Confederate Constitution, blind, neither to the mistake, nor its consequences, were careful to exclude the conclusion of Judge Story. Presenting as a draft, the same Constitution, slightly modified, to be adopted or rejected, by a proceeding identical in its details with that observed in the other case, they have conformed the preamble to the truth of history.  The recital therein is, " we the people of the Confederate States, *each State acting in its sovereign and independent character, do ordain,*" etc."

It is not only true, that the Constitution was ordained by the people of the States, in their separate sovereign characters, but being fully established, it works no transfer of sovereignty. Our theory (as I understand it) is, that sovereignty resides in the people; yet not in the people of the Confederate States as a single body-politic. There is, in truth, no such concrete political community, though, in common parlance, we may find the phrase "people of the Confederate States," convenient. In amendments of the Constitution, and in the appointments of Confederate Executives, Legislators and Judges, the agency of the States, as separate, original sources of power may be traced. There are as many sovereignties as there are States in the Confederacy, and no more. Our recent history furnishes a clear illustration of the proposition. But three years since the States composing the Confederacy, bore the same relation to the United States government that they now bear to that of the Confederate States. By separate action at different times they withdrew from that connection. Let us consider the process by which each State accomplished this result, and the political status of each, on the instant that her withdrawal was complete. We instance Georgia. In her secession from the Federal Union, we note, *first,* that the consent thereto, neither of the Federal government proper, nor of the whole people inhabiting the United States, was obtained or asked ; *secondly,* that the consent of the same people, as constituting separate political communities, or States, (other than the people of Georgia) was neither obtained nor asked ; *thirdly,* that her secession was not the act of her own instituted government, embracing legislative, executive and judicial departments, nor of any one or two of these. It was ordained by her people, in Convention assembled, acting in a capacity, higher than, and superior to any government, State or Federal, theretofore created, or adopted by them. This done, they stood alone, disconnected from all other peoples. Then again, by like action, they acceded to the Confederate States. Meanwhile, their own State government suffered neither overthrow nor suspension from the progress and consummation of these great political movements,

for the reason, that its functions, they have not withdrawn. This action we hold strictly conformable to the political theory adopted by our forefathers and transmitted to us.

Hence we deduce the inferences, *first*, that so soon as the people of Georgia were disenthralled of British dominion, they became invested with sovereignty, in which no other people participated—in virtue of which, they might, in their discretion, for their benefit, delegate certain political powers, of greater or less extent, to one or more governmental agencies, and resume them at pleasure; *secondly*, that under our system, political power and sovereignty are not convertible terms; the State and Confederate governments severally exercising portions of the former, whilst the latter abides unimpaired in the people of each State.

Nevertheless, we maintain that the Confederate government, within the range of its delegated powers, is entitled to implicit obedience. This duty is imposed upon individuals, by the sovereignty of the State to which they belong, and its extent is defined by the compact of all the States, known as the Constitution of the Confederate States of America. These fundamental and well recognised principles should be kept steadily in view, because in this case is involved the inquiry, to what extent the sovereignty of Georgia has yielded the prerogative of protecting the personal liberty of her citizens.

To the second proposition of the counsel, viz: "that the passage of the Conscript Act by the Confederate Congress, was an exercise of one of its delegated powers," we yield our unqualified assent now, as in the case of Jeffers vs. Fair.

We dissent from his third, which is in these words, "no other power can therefore, through its judiciary, interpret that Act. It would be an infringement of its sovereignty."

Sir William Blackstone (1 Commentaries, 49) is referred to in support of this proposition: "By the sovereign power (says the author) is meant the making of laws; for wherever that power resides, all others must conform to and be directed by it, whatever appearance the outward form and administration the government may put on." It is manifest that this principle is inapplicable to our system. The Confederate

Congress can enact no law without express grant, or necessary implication of power, in its Constitution. Even the Legislatures of the States are constitutionally restrained from doing many things. There must be power lodged somewhere to assert lack of authority in the former, and to enforce restraints upon the latter, and of this power (according to the American theory) the judiciary is the depository. It is not true, therefore, without qualification, that "all others must conform to and be directed by" the law-making power. The literal application of the principle to the Confederate Government would render its judiciary equally powerless with those of the States. Let this be conceded, and the Constitution dwindles into nullity, whilst the power of Congress swells into omnipotence. We make no criticism upon authors who claim the attribute for the British Parliament, there are none who assert it for the Confederate Congress. Besides, the learned author is treating, in this connection, of systems in which all political powers are exercised by one government, and he insists that its laws must have a sanction. With us those powers are divided between two. The question in this case is not whether there be means of enforcing laws enacted by one of those governments within the range of its constitutional powers, but whether the other co-existing government may, in any conceivable case, inquire, through its judiciary, whether such a constitutional enactment is being rightfully, according to its intent and meaning, enforced upon one of its citizens in restraint of his personal liberty? Even in the absence of any affiliation or federative relation between governments, it cannot be true that the sovereignty of one is infringed whenever its statute law is judicially interpreted by the other. It often occurs that a right accruing in one State or nation comes to be adjudicated in another, and as it originated and matured under the laws of the former, its adjudication necessarily involves the interpretation of those laws. Regarding all subjects of legislation reserved by the States, Virginia and Georgia are as distinct and as independent as if the Confederate Constitution did not exist, yet by reason of the emigration from one to the other our Courts

Mims and Burdett vs. Wimberly.

are often called upon to construe deeds, and other contracts and testaments made in ·Virginia, by the laws of that State, the application of which draws after it their interpretation. But so far from this being an infringement of her sovereignty or impairment of her authority, it is a direct recognition of both. True, in such cases, if there be in the State, whose law is thus brought in question, a fixed judicial interpretation of it, that is usually adopted in the foreign tribunal, but this being only a rule of interpretation does not affect the principle. If the position assumed be correct, the State Courts could take jurisdiction in no case, the determination of which depended upon the application of a law of Congress. The first paragraph, second section, third article, of the Constitution, defines the extent of the judicial power of the Confederate States. There are sundry specifications, and among others this, "all cases arising under the laws of the Confederate States," and such is the case before us. But it is not declared that this jurisdiction shall be exclusive. Under the corresponding paragraph of the Constitution of the United States (which differs from ours only in two particulars) the judicial power was extended to "controversies between citizens of different States," but it was always held that in those cases the plaintiff might make his election between the State and Federal Courts of the State and district wherein the defendant resided. In Cohens vs. Virginia, 6th Wheaton, 264, at page 396, Chief Justice Marshall remarks: "It has been generally held that the State Courts have concurrent jurisdiction with the Federal Courts, in cases to which the judicial power has been extended, unless the jurisdiction be rendered exclusive by the words of the third article." In order then to divest the State Courts of jurisdiction, in any class of cases previously exercised by them, it must appear that by the Constitution exclusive jurisdiction has been given to the Confederate Courts over that class. The simple extension to it of their jurisdiction will not produce that result. It does not follow that this construction would lead to conflict of jurisdiction or to simultaneous action of State and Confederate Courts upon the same subject matter between the

same parties. The Superior and Inferior Courts of Georgia have concurrent jurisdiction, except in equity causes, criminal causes, causes respecting the title to real estate, and divorce causes, yet no conflict arises. The plea of former recovery, or of the pendency of a previous action, will always induce the Court in which the later suit may be instituted, to dismiss it. " In all cases of concurrent jurisdiction, the Court which first has possession of the subject must decide it." Smith vs. McIver, 9th Wheaton, 532. So, whenever, by the return to a *habeas corpus*, issued by a State judge, if it be made to appear that the personal liberty of the promovant is restrained by the process of a Confederate Court having jurisdiction of the subject, it would be the duty of the former to dismiss the writ, and thus avoid a conflict. Such was the question arising in Ableman vs. Booth, 21 Howard, 506 ; and although the language of Chief Justice Taney, on page 524, would seem to admit of extension to all cases of imprisonment by authority of the United States, it must be borne in mind that the question of imprisonment, by authority other than judicial, was not in that case. The distinction between the two classes of cases was not taken, and the opinion, in so far as it overleaps the case before the Court, is *obiter dictum.* Where the power of imprisonment is exercised by one claiming authority, other than judicial, under an Act of Congress, within the limits of a State, any magistrate of that State having authority to issue the writ of *habeas corpus* may inquire into its legality, and even military officers are not exempt from this jurisdiction, but owe obedience to the final judgment.

Reference is made to the case of Ferguson, 9th Johnson, 239. In that case the Supreme Court of New York declined to interpose and inquire into the legality of the detention of a citizen by the military authorities of the United States, but although Chief Justice Kent was strongly inclined (*at that time*) against the jurisdiction of the Court, his associates, Thompson, Van Ness, Spencer and Yates, expressly reserved the question of jurisdiction, and placed their refusal of the writ on the broad discretion given the Court in term time.

But in the case of Stacey, (10th Johnson, 328,) the Commissioner having issued a *habeas corpus* against General Lewis, of the United States Army, requiring him to produce the body of Stacey, and show the cause of his confinement, and Lewis having made an evasive return, the same Court, constituted of the same persons, Chief Justice Kent delivering the opinion, assumed jurisdiction, and attached Lewis for contempt.

In the first volume of his Commentaries, 400, 401, under the title "Concurrent jurisdiction of the State Governments," Chief Justice Kent refers to these cases. Of the case of Ferguson, he says, "It was much discussed whether the State Courts had concurrent jurisdiction, by *habeas corpus*, over the question of unlawful imprisonment, when the imprisonment was by an officer of the United States, by color, or under pretext of the authority of the United States. The Supreme Court did not decide the question, and the motion was denied on other grounds ; but subsequently, in the matter of Stacey, the same Court exercised jurisdiction in a similar case, by allowing and enforcing the writ of *habeas corpus*. The question was therefore settled in favor of a concurrent jurisdiction in that case, and there has been a similar decision and practice in the Courts of other States."

In the cases of the Commonwealth vs. Harrison (11th Mass. 63) and Ibid vs. Cushing, (11th Mass. 67) both involving the detention of citizens, by the military authorities, and the question being as to the legality of their enlistment in the United States army, this jurisdiction was assumed by the Courts of Massachusetts, and no doubt seemed to be entertained that it was rightfully done. See also Comm'th vs. Holloway, 5th Benney 512.

There is a provision in the Constitution of the Confederate States, which affords a conclusive answer to the proposition under consideration, viz: no other power can through its judiciary, interpret a law of the Confederate Congress, constitutionally enacted. The third section of the sixth article is in these words, " this Constitution and the laws of the Confederate States made. in pursuance thereof, etc., shall be

the supreme law of the land, and the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." They shall be thus bound, not as citizens, but as judges. Why bind them officially, by a provision of the Constitution, if they are not officially to take cognizance of those laws and apply them? And how apply them, without interpreting them? This obligation resting upon the Judges of the States, removes any well founded apprehension that they will unduly obstruct or hinder the Confederate government in the exercise of its proper functions. That Government must at all times employ ministerial agents in the execution of its laws, and not unfrequently citizens of the States are by them taken into custody, without antecedent adjudication, and consequently without the guidance of judicial process, as in cases of enrollment for military service. It should be no matter of surprise if they occasionally mistake their own powers, or the liabilities of the citizens, under the law they are empowered to execute. That the State of Georgia owes to her citizens protection against illegal restraint of their personal liberty, and that this protection is to be extended through her judiciary, in all cases wherein she has not transferred jurisdiction from it to the Confederate judiciary, may not be doubted.

We are unable to perceive that she has done so in cases of this character, and in conclusion, we borrow from Chief Justice Kent, in the case of Stacey, a clear and forcible statement of our duty in the premises. "This is a case which concerns the personal liberty of the citizens. *  *  *  * It is the indispensable duty of this Court, and one to which every inferior consideration must be sacrificed, to act as a faithful guardian of the personal liberty of the citizen, and to give ready and effectual aid to the means provided by law for its security. One of the most valuable of these means is the writ of *habeas corpus*, which has been justly deemed the glory of the British law."

We, therefore, affirm the judgment of the Court below.

Let the judgment be affirmed.